FILED
United States Court of Appeals
Tenth Circuit

April 1, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff–Appellee,

v.

DION LAMY,

     Defendant–Appellant.

No. 07-2048

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-04-1677-JB)**

John F. Moon Samore, Albuquerque, New Mexico, for the Defendant–Appellant.

David N. Williams, Assistant United States Attorney, (Larry Gomez, United States Attorney, with him on the brief) Albuquerque, New Mexico, for the Plaintiff–Appellee.

Before **LUCERO**, **HARTZ**, and **GORSUCH**, Circuit Judges.

**LUCERO**, Circuit Judge.

Dion Lamy appeals his jury conviction on three counts of aggravated sexual abuse in Indian country in violation of 18 U.S.C. §§ 2, 1153, and 2242(2)(B). Lamy contends that the district court improperly admitted a statement he gave to

FBI agents; that the court abused its discretion in denying a motion for new trial based on prejudicial comments by a government witness; and that the United States failed to prove that Lamy's crime occurred in Indian country, an element of his crimes of conviction. Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM**.

**I**

Lamy, a member of the Zuni tribe, was indicted for a sexual assault that occurred in June, 2002 after a high school graduation party in Zuni, New Mexico. Lamy, 18 years old at the time of the assault, left the party with four other men: Aaron Cheama, Donovan Jones Neha, Marcus Tsethlakai, and Daryl Dickson. Accompanying the men were two young women: R.D., a 17-year-old acquaintance, and Kathy, Dickson's girlfriend. R.D. was drunk and under the influence of both cocaine and marijuana. Lamy, who had not been drinking, drove the group to the home of Sherry Shebola. When they arrived, some members of the group carried R.D. inside, and placed her on a couch where she passed out. At trial, R.D. denied any memory of events at the Shebola house until she awoke the next morning.

Cheama and Tsethlakai were able to testify as to what occurred while R.D. was unconscious. We have carefully reviewed this testimony and see no useful purpose in exploring the sordid details. Briefly, Cheama testified that Lamy penetrated the victim's vagina with an object; both witnesses testified that Lamy

beat the victim while Neha engaged in sexual intercourse with her; and Tsethlakai testified that he saw Lamy engage in sexual intercourse with her the following morning, while she remained unconscious.

When R.D. awoke the following day, each of the five men save Neha were gone. Shebola remained in the house and communicated certain events to R.D. that led R.D. to conclude that she had been raped. A brief conversation between R.D. and Neha followed. After an altercation with Shebola and yet another woman, R.D. ran from the house to a nearby hospital. A hospital aide transported R.D. to her home. R.D. immediately told her family of her suspicions, leading her mother to refer the matter to police and return her daughter to the hospital. At the hospital, a test for sexual trauma was administered.

On July 22, 2002, FBI Agents Marcus McCaskill and Steve Chambers interviewed Lamy twice in connection with these events. McCaskill knew Lamy, having spoken with him on two prior occasions in the process of investigating unrelated crimes. McCaskill and Chambers began the first July 22 interview shortly before 10:00 a.m. in the living room of the house where Lamy lived with his mother. Before questioning Lamy, the agents presented a form that contained a waiver of Miranda rights. McCaskill testified that the agents also orally explained Lamy's rights to him, although the agents did not read the form verbatim. They told Lamy that he was not in custody and that they did not intend to arrest him. Lamy signed the form. During the ensuing interview, Lamy

admitted that he penetrated the victim with an object, but he denied engaging in sexual intercourse with her. He committed this statement to writing.

After interviewing Neha, Dickson, Cheama, and Tsethlakai, the agents returned to Lamy's home. Lamy agreed to accompany the agents outdoors, and sat in the front passenger seat of the agents' parked vehicle as they questioned him. The agents did not further advise Lamy of his rights on this occasion.

Based on what they had learned from the intervening interviews, the agents asked Lamy specific questions about his role in the events. Lamy admitted to beating the victim and having sexual intercourse with her. Lamy then wrote and signed a second statement, stating:

> I Dion Lamy is goind to tall you the truth about wunt happed to that girl at frist I did not tall all the truth becouse I was cared to tall but the thing I did was sbaeet her wath by baet and have six wath her brent her har and touch her parvant part that is obout all the thing's I did to her I am so sorry

On August 25, 2004, Lamy, Neha, and Cheama were indicted for assault and sexual assault. Tsethlakai and Dickson were juveniles at the time of the crime and were indicted separately. In return for a lesser charge, Cheama cooperated with the government, leaving Lamy and Neha as the sole defendants in a seven-count superceding indictment filed on February 25, 2005.

Both were tried in a consolidated trial. Four of seven counts in the indictment were dismissed, and the three remaining counts were sent to the jury.[1] Counts One and Two alleged that both Lamy and Neha committed a sexual act with an unconscious victim, and that each aided and abetted the other, in violation of 18 U.S.C. §§ 2, 1153, and 2242(2)(B). Count Three alleged that Lamy penetrated the victim's vagina with an object and Neha aided and abetted him in doing so, in violation of §§ 2, 1153, and 2242(2)(B). These incidents were alleged to have occurred in Indian country, making them federal crimes under the Indian Major Crimes Act. See § 1153(a).

Before trial, Lamy moved to suppress his oral and written statements on the ground that they were involuntary. During the ensuing suppression hearing, an expert witness who had examined Lamy testified that Lamy was easily confused and inclined to acquiesce to others' conclusions. According to the expert, Lamy read at a second-grade level, ranked in the lowest percentile of his age group in reading comprehension, and was "functionally illiterate." The expert concluded that Lamy, an "F" student who dropped out of school after the eighth grade, was

---

[1] Counts Four and Five, alleging that Lamy committed assault by striking, beating, wounding, and setting R.D.'s pubic hair on fire in violation of 18 U.S.C. §§ 2, 113(a)(4), and 1153 were dismissed on the government's motion. Counts Six and Seven, charging sexual contact in violation of §§ 2, 1153, and 2244(a)(2), were dismissed by the trial court because the indictment failed to state that the victim was incapacitated, an element of § 2244(a)(2).

not mentally retarded, but that his "ability to integrate information [was] at the retarded level."

At the hearing, Agent McCaskill testified that Lamy appeared to understand him at all times, and that they had no communication problems. McCaskill was unaware that Lamy was a poor student. Lamy's mother testified that she was present in the house during the first interview. She heard no inappropriate noise, such as raised voices. She also confirmed that Lamy did not appear to have been crying after his return from the second interview.

On the testimony recounted above, the district court denied the suppression motion and a later motion for reconsideration. The case proceeded to trial, at which typewritten transcripts of both written statements, as well as testimony about Lamy's oral admissions, were admitted into evidence.

On close of trial, both Lamy and Neha were convicted of the three counts. Lamy sought a new trial under Federal Rule of Criminal Procedure 33 based on the admission of his oral and written statements and on several prejudicial statements volunteered by McCaskill during his trial testimony. Lamy also moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, alleging that the government failed to prove an element of the crime, namely, that it occurred in Indian country. The court denied both motions. Lamy appeals.

**II**

Lamy contends that the district court erred in denying the motion to suppress the written and oral statements that he made during the two interviews. He contends that his limited cognitive capabilities prevented him from giving truly voluntary statements, and that the admission of these statements accordingly violated his due process rights. Lamy also argues that he was unable to intelligently waive his legal rights, and thus the agents' questioning violated Miranda v. Arizona, 384 U.S. 436 (1966).

In considering the denial of a suppression motion, we review factual findings for clear error, viewing the evidence in the light most favorable to the government. United States v. Thompson, 354 F.3d 1197, 1199 (10th Cir. 2003). Because Lamy has not provided a transcript of McCaskill's or his mother's testimony at the suppression hearing, we necessarily accept the district court's factual findings and credibility determinations on point. See Fed. R. App. P. 10(b)(2); United States v. Verduzco-Martinez, 186 F.3d 1208, 1215-16 (10th Cir. 1999). Legal determinations, including whether a statement was voluntary and whether a defendant was in custody, are reviewed de novo.[2] United States v.

---

[2] Lamy does not appear to have raised the Miranda argument before the district court. We would normally review the denial of his suppression motion in such circumstances for plain error. United States v. Hernandez-Rodriguez, 352 F.3d 1325, 1328 (10th Cir. 2003). The government, however, concedes in its brief that we should review the denial de novo. Because Lamy's claim fails even under de novo review, we do not decide whether plain error review should apply under these circumstances.

Nguyen, 155 F.3d 1219, 1222 (10th Cir. 1998) (voluntariness); United States v. Erving L., 147 F.3d 1240, 1246 (10th Cir. 1998) (custody).

**A**

We begin by considering Lamy's due process argument. A statement is involuntary in violation of due process if "a defendant's will was overborne by the circumstances surrounding" his confession. Dickerson v. United States, 530 U.S. 433, 434 (2000) (quotation omitted). Though relevant, a defendant's mere subjective lack of understanding or volition does not give rise to a constitutional violation. "[C]oercive police activity is a necessary predicate" to a constitutionally involuntary confession. Colorado v. Connelly, 479 U.S. 157, 167 (1986). Accordingly, our ultimate inquiry is whether the officers took "unfair advantage of [the] defendant's traits or the surrounding circumstances." United States v. Guerro, 983 F.2d 1001, 1004 (10th Cir. 1993). Factors relevant to this determination include:

> (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment.

United States v. Toles, 297 F.3d 959, 966 (10th Cir. 2002) (citation omitted).

Focusing on the first factor, Lamy directs us to his lack of intelligence and education. Expert testimony at his suppression hearing indicated that he was functionally illiterate, reading at a second-grade level, that he flunked out of

- 8 -

school after the eighth grade, and that he was psychologically inclined to acquiesce to authority figures. On the other hand, McCaskill testified that he had no difficulty communicating with Lamy throughout the two interviews and that Lamy appeared to understand what was happening. Moreover, the fact that Lamy had been interviewed by McCaskill previously indicates that Lamy had some experience with, and understanding of, police questioning. See id. In sum, although the record reveals that Lamy's intelligence is below average, it also shows that he was capable of understanding the agents' questions and assessing the risks of answering or declining to answer those questions.

As for the remaining factors, Lamy's first interview with the agents was conducted in the kitchen of his home and lasted less than an hour. His mother was in the house throughout the entirety of the interview and occasionally entered the living area where the interview was taking place. The officers never raised their voices. Lamy alleges no physical punishment, nor any coercive conduct by the agents during this interview. The short length of detention and questioning, nonthreatening nature of questioning, and lack of any physical punishment all indicate that Lamy's statements were not coerced.

Considering the fourth factor, the agents advised Lamy of his constitutional rights immediately before the first interview began. They did not merely hand Lamy a written statement of his rights; McCaskill explained Lamy's rights to him orally before Lamy signed the waiver form. The officers also told Lamy

explicitly that he was not in custody and that they did not intend to arrest him. We perceive no aspect of this interview which indicates that the agents "took unfair advantage" of Lamy's traits or coerced his statements. Guerro, 983 F.2d at 1004. We conclude that the district court correctly rejected Lamy's due process argument regarding the first interview.

Similarly, the facts surrounding the second interview show no indication that the agents overwhelmed Lamy's will. Lamy points to one feature of the questioning which he considers coercive: He was questioned in the officers' vehicle.[3] However, Lamy was not taken to the vehicle by force; he agreed to accompany the agents and answer additional questions. Lamy's mother noticed no untoward behavior on his part upon his return. Although the agents did not read Lamy his rights a second time before the brief afternoon interview, he had been adequately advised several hours earlier, and McCaskill informed Lamy before the afternoon interview that "the things that we told him before were the same."

Considering the totality of the circumstances, we agree with the district court that Lamy's written and oral statements in this interview were not

---

[3] Lamy also stresses that the interview was not recorded. Although the failure to record might be probative of the credibility of McCaskill's description of the events, we must of course defer to the district court's determination that McCaskill's testimony was credible. Erving L., 147 F.3d at 1246.

improperly adduced.  Accordingly, denial of Lamy's suppression motion on due process grounds stands.

**B**

In the alternative, Lamy argues that the agents' questioning violated Miranda v. Arizona, because he was incapable of waiving his Fifth Amendment rights due to his low intelligence.  Miranda's protections, however, apply only when an individual is subjected to "custodial interrogation."  United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000).  Given our conclusion that Lamy was not in custody, the premise of the argument fails.

Our decision that Lamy was not in custody for Miranda purposes flows from our seminal inquiry:  "whether a reasonable person in [Lamy's] position would have understood [his] freedom of action to have been restricted to a degree consistent with formal arrest."  United States v. Revels, 510 F.3d 1269, 1275 (10th Cir. 2007).  The standard is an objective one; unlike the due process inquiry, particular characteristics of the defendant are relevant only "to the extent that they may have been known to the officer and influenced his conduct."[4] United States v. Little, 18 F.3d 1499, 1505 (10th Cir. 1994) (en banc) (quotation omitted).  In conducting this fact-intensive inquiry, relevant factors include:

---

[4] In this regard, we note that McCaskill may have had some understanding of Lamy's general intelligence and abilities due to his prior interviews with Lamy.  He specifically testified that he was unaware, however, of Lamy's poor school performance.  As we conclude above, we see no evidence that McCaskill took advantage of any knowledge he had regarding Lamy's traits.

"(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [Lamy] aware that [he] was free to refrain from answering questions, or to otherwise end the interview." Revels, 510 F.3d at 1275.

Lamy's initial interview was conducted by two officers in a common area of his home, during which his mother came and went from the room. Under our precedents, this does not constitute a police-dominated atmosphere. See Erving L., 147 F.3d at 1247 (holding that an adolescent suspect interviewed by plainclothes officers in his living room with his parents present was not in custody); cf. Revels, 510 F.3d at 1275 (holding that questioning in a defendant's home was custodial when seven officers entered forcibly, handcuffed the occupants, and questioned the defendant in a rear bedroom). As for the "nature or length" of questioning, the interview lasted for about an hour and, as noted, there was no indication that the questioning was unusually confrontational. The agents informed Lamy that he did not have to answer questions and that he could terminate the interview at any time. In these circumstances, a reasonable person in Lamy's position would hardly have felt the requisite level of constraint.

The second interview took place in the agents' car, which was parked outside Lamy's house, and Lamy sat in the front passenger seat of the vehicle. Although the vehicle belonged to the agents, location alone does not compel the

conclusion that a defendant is in custody, so long as his freedom was not curtailed to a degree similar to arrest. See, e.g., California v. Beheler, 463 U.S. 1121, 1125 (1983) ("Miranda warnings are not required simply because the questioning takes place in the station house . . . ." (quotation omitted)); United States v. Boucher, 909 F.2d 1170, 1174 (8th Cir. 1990) ("Miranda warnings are not imposed because the questioning is conducted in a certain place, i.e., a patrol car . . . ."). In this case, Lamy was asked, not ordered, to accompany the agents to the vehicle. He did so of his own volition. This voluntary decision to accompany police argues against police domination. Cf. Beheler, 463 U.S. at 1122, 1123 (holding that a stationhouse interrogation was noncustodial where the suspect "voluntarily agreed to accompany police to the stationhouse, although the police specifically told [him] that he was not under arrest"). Moreover, the record does not suggest that Lamy was ever handcuffed, and his position in the passenger seat of the vehicle suggests a lack of arrest. See United States v. Plumman, 409 F.3d 919, 924 (8th Cir. 2005) (holding that a suspect was not in custody during questioning in an FBI agent's vehicle where he was seated in the front seat and informed that he would not be arrested); United States v. Scheets, 188 F.3d 829, 842 (7th Cir. 1999) (holding that a suspect was not in custody while he sat in the front seat of a police car). Cf. United States v. Henley, 984 F.2d 1040, 1042 (9th Cir. 1993) ("It is fair to say that someone who is being questioned by an FBI agent while sitting

handcuffed in the back of a police car is, indeed, not free to leave." (emphasis added)).

The second and third factors identified above also indicate that the afternoon questioning was noncustodial. Nothing in the record indicates that the agents threatened or aggressively questioned Lamy during the quarter-hour interview. At the beginning of the interview, the agents reiterated to Lamy that he would not be arrested that day regardless of how he answered their questions, and told him that the warnings he had been given that morning remained in effect. Thus, Lamy remained aware that he was free to leave or refuse to answer questions. Based on the totality of the circumstances, we conclude that Lamy's freedom of action was not curtailed to a degree similar to formal arrest, and thus Lamy was not in custody during the second interview.

Because Lamy was not subjected to custodial interrogation, the agents did not improperly question him, regardless of whether he had waived his Miranda rights. We conclude that the district court was correct to deny suppression on this ground as well.

### III

Our next considerations of error are McCaskill's comments during trial. Lamy contends that these remarks were so prejudicial as to violate his Sixth Amendment right to a fair trial, and that the district court should have ordered a new trial. Lamy objects to three statements. The first occurred during direct

- 14 -

examination when the prosecutor asked McCaskill how he became involved in the

Lamy investigation.  McCaskill responded:

> I was not the primary agent in the case . . . .  I had met with [Lamy]
> on prior occasions, and my partner, Steve Chambers, knew about that
> contact, and we both thought it would be a good idea for me to go
> down and do some of the interviews with him, given that I knew
> [Lamy] from previous occasions.

Lamy's counsel did not object to this testimony when it was made, although it

was referenced in counsel's objection to McCaskill's second contested statement.

McCaskill was asked to authenticate a copy of a written statement produced

by Neha during his interview with the agents.  The statement contained several

redactions.  McCaskill commented that "[t]here were a few words that do not

appear in this particular version of it because of legal things that have gone on

in—in this case."  At that point, Lamy objected and moved for a mistrial on the

ground that this statement, combined with McCaskill's previous statement about

prior contact with Lamy, incurably prejudiced him.  The court gave a curative

instruction,[5] allowed the prosecutor to lead McCaskill through the remainder of

---

[5]  The court instructed the jury as follows:

> There has been evidence that Donovan Neha gave one or more
> statements to the investigating authorities in this case.  You may
> consider any such statement of defendant Donovan Neha only in
> deciding the charges against him, and not in deciding the charges
> against his codefendant Dion Lamy. . . .  You may not consider any
> such statement in any way when you are deciding if the Government
> has proven its case against the codefendant Dion Lamy.

his testimony to avoid any further prejudicial statements, and denied admission of Neha's written statement into evidence.

The third contested statement arose when, in describing the agents' first interview with Lamy, McCaskill stated that Lamy's mother "knew why we were talking to him. She understood." Lamy's counsel immediately objected that Lamy's mother's knowledge was outside McCaskill's personal knowledge. See Fed. R. Evid. 602. The court instructed the jury to "disregard that at this present time, about what the mother knew." Lamy argues that the combined prejudice from McCaskill's three statements was so severe that he was denied a fair trial, and that the district court's denial of a new trial constituted an abuse of its discretion.

**1**

With regard to McCaskill's first statement, Lamy argues that it prejudiced him by implying that he has a criminal past, evidence of which is generally inadmissible under Federal Rule of Evidence 404(b). Because a "timely objection, accompanied by a statement of the specific ground of the objection, must be made when evidence is offered at trial to preserve the question for appeal," and none was made, we review this claim only for plain error. United States v. Norman T., 129 F.3d 1099, 1106 (10th Cir. 1997); see also Fed. R. Evid. 103(a)(1); Fed. R. Crim. P. 51(b). Plain error is "(1) error, (2) that is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness,

integrity, or public reputation of judicial proceedings." United States v. Romero, 491 F.3d 1173, 1178 (10th Cir. 2007). "For an error to have affected substantial rights, the error must have been prejudicial: It must have affected the outcome of the district court proceedings." Id. at 1179 (quotation omitted).

Lamy's argument fails on the third prong of this analysis, because in light of the overlapping and detailed evidence supporting Lamy's conviction on each count, McCaskill's vague suggestion that Lamy had prior contact with the FBI was only marginally prejudicial. Both Cheama and Tsethlakai testified that they saw Lamy beat the victim while Neha engaged in sexual intercourse with her. Tsethlakai testified that he saw Lamy have sexual intercourse with the victim the following morning, and Cheama testified that Lamy penetrated the victim with an object. Lamy admitted to each of these allegations in his interviews with the agents and his statements were admitted at trial. Given the weight of this evidence, Lamy fails to show that the alleged error affected his substantial rights. See, e.g., United States v. Avalos, 500 F.3d 972, 975-76 (10th Cir. 2007) (holding that even if the district court erred in admitting a defendant's statement that he sold drugs in the past, "such error was harmless given the weight of the Government's case").

**2**

Because Lamy timely objected to each of McCaskill's later statements, we review the district court's denial of Lamy's motion for a new trial for an abuse of

discretion. United States v. Gwathney, 465 F.3d 1133, 1144 (10th Cir. 2006).

Denial of a new trial "is an abuse of discretion only if it is arbitrary, capricious,

whimsical, or manifestly unreasonable." Id. (quotation omitted). District courts

view motions for new trials with disfavor, United States v. Quintanilla, 193 F.3d

1139, 1146 (10th Cir. 1999), granting a new trial only if compelled by "the

interest of justice," Fed. R. Crim. P. 33. In determining whether a new trial is

required after a witness offers improper information, we consider "(1) whether the

prosecutor acted in bad faith, (2) whether the district court limited the effect of

the improper statement through its instructions to the jury, and (3) whether the

improper remark was inconsequential in light of the other evidence of the

defendant's guilt." United States v. Meridyth, 364 F.3d 1181, 1183 (10th Cir.

2004).

Under the first factor, Lamy admits that the prosecutor did not act in bad

faith, as "the record indicates that the remarks were volunteered" by McCaskill,

rather than deliberately elicited by the government. As for the second factor, the

district court gave curative instructions addressing each of these statements in

response to Lamy's objections. "We presume that jurors will follow clear

instructions to disregard evidence 'unless there is an overwhelming probability

that the jury will be unable to follow the court's instructions, and a strong

likelihood that the effect of the evidence would be devastating to the defendant.'"

United States v. Caballero, 277 F.3d 1235, 1243 (10th Cir. 2002) (quoting Greer

v. Miller, 483 U.S. 756, 766 n.8 (1987)).  On these standards we can discern no reason why a jury might have found it unusually difficult to disregard McCaskill's volunteered comments.

This leaves the third factor.  Lamy argues that McCaskill's comment regarding redactions in Neha's statement prejudiced him because it gave the jury "the impression the trial court had tied the hands of noble law enforcement officers" by keeping incriminating evidence from the jury's consideration, and that the statement about his mother prejudiced him by suggesting that he spoke with the agents voluntarily.  At oral argument, Lamy's counsel also suggested that although Neha's statement did not in fact mention Lamy, the jury might have inferred that it was Lamy's name which was redacted from the statement.[6]  Any improper effect McCaskill's intimations may have had on the jury, however, pales in comparison to the total weight of the government's evidence on each count, as described above.  We conclude that the Meridyth factors are not met.

**3**

Lamy urges that the district court's decision to allow leading questions as a mechanism to avoid future improper comments by McCaskill prejudiced him by

---

[6] Much of the government's brief addresses an argument, raised in Lamy's motions for mistrial and new trial, that Gray v. Maryland, 523 U.S. 185 (1998), requires a new trial.  See id. at 192 (holding that the Sixth Amendment requires that a codefendant confession admitted into evidence at a joint trial must be redacted so as to leave no hint that the confession originally referenced the defendant).  Because Lamy himself has not raised this argument on appeal, we do not address it.

allowing the prosecutor to shape McCaskill's testimony.[7] Lamy does not identify any examples of prejudicial leading, however. Our review of the record fails to disclose any such incidents, let alone cumulative prejudice.

While we do not condone these remarks, it is clear that the district court did not abuse its discretion in denying Lamy's motion for a new trial. We affirm that denial.

## IV

We now consider Lamy's contention that the United States did not prove beyond a reasonable doubt that his crimes occurred in Indian country, as required by 18 U.S.C. § 1153(a). We review challenges to the sufficiency of the evidence de novo, viewing all evidence in the light most favorable to the government. United States v. Schaefer, 501 F.3d 1197, 1199 (10th Cir. 2007). We "affirm[] the district court unless no reasonable jury, when presented with the evidence introduced at trial together with the reasonable inferences therefrom, could find the defendant guilty beyond a reasonable doubt." Id. at 1200 (quotation omitted).

Lamy does not contest the government's proof that the Shebola house was located within the borders of the Zuni reservation at the time of trial in November

---

[7] Under the Federal Rules of Evidence, district judges have discretion to allow leading questions. See Fed. R. Evid. 611(c) ("Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony."); United States v. Olivo, 69 F.3d 1057, 1065 (10th Cir. 1995). Lamy does not argue that the district court abused its discretion under Rule 611(c), but only that the results of the decision added to the cumulative prejudice against him.

2005. He urges, however, that the government failed to prove that the house was so located on June 15 and 16, 2002, when Lamy's crimes allegedly took place. Because reservation boundaries can and do change, Lamy argues that the jury could not simply assume that a location currently within the boundaries of the reservation was necessarily within those boundaries in the past.[8]

Indian country situs assuredly is an essential element of crimes under § 1153. See United States v. Anderson, 391 F.3d 1083, 1086 (9th Cir. 2004) (explaining that § 1153 is an "[e]nclave law . . . in which the situs of the offense is an element of the crime"). It must therefore be proven by the prosecution beyond a reasonable doubt. Indian country by definition includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government." United States v. Burch, 169 F.3d 666, 669 (10th Cir. 1999) (quoting 18 U.S.C. § 1151(a)).

At trial, Dancy Simplicio, an expert witness who had worked in the Zuni realty office since before 2002, testified for the government regarding the location of the Shebola house. Simplicio began by recounting the history of the reservation, and explained that its boundaries have been increased periodically by

---

[8] Lamy argues that the government was required to prove that the Shebola house was not located on a non-Indian-owned "checkerboard" area within the reservation. He is mistaken. Such areas are defined as Indian country if they are within the exterior boundaries of the reservation. 18 U.S.C. § 1151(a); see also Pittsburg & Midway Coal Mining Co. v. Yazzie, 909 F.2d 1387, 1422 (10th Cir. 1990).

executive order. Simplicio did not specifically address whether any boundary changes had occurred after 2002. When Simplicio was asked to locate the Shebola house on an aerial photograph and on a map of the reservation, the dates of the photograph and map were not discussed. According to Simplicio, the house was "[d]efinitely more than a mile" within the reservation's exterior boundary.

Several lay witnesses confirmed the location of the house during the course of their testimony about the events on the night of the assault.[9] As an example, victim advocate Lasha Peyketewa testified that she went to the home of Sherry Shebola on June 16, 2002. She was then asked whether that house "is" within the Zuni reservation, and she responded affirmatively. Later, Peyketewa was shown an aerial photograph of the Shebola house, and again confirmed that it "is" on the reservation. She was then asked whether she found Shebola there "on the 16th of June." Although the questions about the house's location were phrased in the present tense, they were asked and answered in the context of the crime, indicating that Peyketewa's mind was focused on the circumstances existing at that time. Peyketewa testified that prior to working as a victim advocate, she was

---

[9] Lamy's opening brief makes a conclusory assertion that lay witnesses are not competent to testify to the location of reservation boundaries. However, the only case he cites in support of this proposition, United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998), does not address the competence of lay witnesses. Because Lamy fails to support this assertion with "reasoned argument," it is forfeited on appeal. See United States v. Beckstead, 500 F.3d 1154, 1165 (10th Cir. 2007).

a patrol officer with the Zuni Police Department, a job that the jury could reasonably conclude required familiarity with the boundaries of the reservation.

Similarly, both Cheama and R.D. testified that they have lived on the Zuni reservation for their whole lives and that the house "is" within the reservation. From this testimony, the jury could reasonably infer that the house was within reservation boundaries at all times within the knowledge of these witnesses.[10]

We conclude that, viewed in the light most favorable to the government, the evidence gives rise to an inference sufficient for a reasonable jury to find beyond a reasonable doubt that the Shebola house was within the borders of the Zuni reservation on June 15 and 16, 2002.

**V**

**AFFIRMED**.

---

[10] This case is easily distinguishable from United States v. Romero, 136 F.3d 1268 (10th Cir. 1998). In Romero, we held that in the absence of testimony about the victims' non-Indian status, a jury could not infer that status from the victims' "names, appearance, speech, and testimony that they did not grow up on the Nambe Pueblo," because these characteristics have no necessary relationship to "the complex legal definition of Indian status." Id. at 1274. By contrast, this jury heard direct testimony about the house's legal status within the reservation, and was asked to infer only that this status had not changed since the time of the crime.