FILED
United States Court of Appeals
Tenth Circuit

November 28, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MARVIN WAYNE MAGNAN,

    Defendant - Appellant.

No. 17-8026
(D.C. No. 2:16-CR-00099-SWS-1)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BALDOCK**, **MATHESON**, and **EID**, Circuit Judges.
_____

Defendant-Appellant Marvin Wayne Magnan appeals following his conviction

on twelve counts of aggravated sexual abuse, abusive sexual contact, sexual abuse,

and sexual abuse of a minor, in violation of 18 U.S.C. §§ 2241(c), 2244(a)(3),

2242(2)(A), 2243(a), 2244(a)(5), and 1153. He was sentenced to a total of 108 years'

imprisonment. On appeal, he argues that: (1) it was plain error when the

government's expert witness testified that studies had shown that children lie about

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however,
for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R.
32.1.

being sexually abused around 2 to 4 percent of the time; (2) the district court abused its discretion by allowing witnesses to testify regarding prior consistent statements by victims; (3) it was plain error for the district court to allow testimony as to uncharged acts of sexual abuse; (4) the prosecution committed plain error when, during closing argument, the government said, "[a]nd as [the victims] testified, perhaps you saw their parents in the audience crying, it probably was the first time that they had heard those details"; (5) the cumulative impact of evidence-related errors prejudiced the defendant; and (6) the jury was improperly instructed about the definition of "sexual act," and reversal is required for the counts that used the erroneous definition.

As to Magnan's first argument, evaluating for plain error, we find that the expert testimony was admitted in error, but conclude that the error did not affect Magnan's substantial rights. Second, evaluating for abuse of discretion, we conclude that the prior consistent statements were admitted in error, but that the error was harmless. Third, after undertaking our own analysis, we determine that the uncharged acts of sexual abuse were properly admitted. Fourth, under plain error review, we conclude that Magnan has not shown that the prosecutor's brief comment impacted his substantial rights. Fifth, we reject Magnan's cumulative error argument. Finally, under a plain error review, the instructional error, which erroneously converted "and" to "or" in its definition of "sexual act" as compared to its definition in 18 U.S.C. § 2246, did not affect Magnan's substantial rights because this part of definition was not at issue in the relevant counts.

2

## I.

### A.

Magnan and his wife Eva raised Eva's niece Michelle McGill. Michelle McGill and Jerry McGill are married and have three daughters (from oldest to youngest): R.M., Je.M, and Ja.M. The McGills also cared for C.A., who is the daughter of Michelle's sister, for most of C.A.'s life. When they were children, the McGill daughters and C.A. would often visit Magnan and Eva and referred to them as "grandpa" and "grandma."

In August of 2012, R.M., Ja.M, Je.M, and C.A. disclosed to their parents that they had been repeatedly touched in sexually abusive ways by Magnan. Jerry and Michelle notified law enforcement, and an investigation commenced. The FBI interviewed the children, who then gave their first detailed accounts of the alleged abuse. However, the investigating agent was subsequently transferred to another state, and the investigation lay dormant for roughly a year and a half. In April 2014, Special Agent Paul Swenson learned of the lapsed investigation and began working on it. Over the course of his investigation he identified and interviewed other girls who alleged Magnan abused them. One was A.A., Magnan's daughter who lived with him and Eva for a year; the other was M.S., a next-door neighbor to the Magnans.

Prior to trial, the government filed a notice of intent and then a subsequent supplemental notice to offer evidence pursuant to Federal Rules of Evidence 413 and

3

414, or in the alternative, Rule 404(b).  The evidence the government sought to introduce was testimony from the named victims of uncharged occasions where Magnan inappropriately touched them.  Vol. 1 at 81.  Before the trial, the parties convened so the court could explain its denial of a motion to sever the charges.  Vol. 3 at 24.  During its explanation for that ruling, the court also indicated that prior act evidence would be admissible in this case under Rules 413 and 414.  *Id.* at 28–30.

The allegations of the child victims covered a range of sexual misconduct.  C.A., A.A., Ja.M., Je.M., R.M., and M.S. testified about many instances, including those outside of the charged incidents, where Magnan found opportunities to touch them in sexually abusive ways.  The allegations of five of these six women were the basis of the twelve counts of sexual abuse brought against Magnan.

**B.**

At trial, the government's first witness was an expert in the psychology and treatment of abused children and adolescents, Dr. Fred Lindberg, who testified as to the general characteristics of abusers and abuse victims.  Relevant to this appeal, Dr. Lindberg also testified as to the rate of false accusations of child sexual abuse.  He stated that "the rate of false disclosures by or false allegations exclusively by a child was in the 2 to 4 percent range.  Some literature goes as high as 5, maybe a little higher.  But the standard studies that are frequently quoted are 2 to 4 percent."

4

In addition to the victims, the government also called witnesses to testify that the victims told them of the abuse around the time it was occurring. The government called Eileen SunRhoades, who testified that Ja.M. told her in secret that her grandfather was touching her. The defense objected to this testimony under Federal Rule of Evidence 803,[1] but the court overruled the objection under Rule 801(d)(1)(B).[2] Similarly, the government called Elsie Marquez, who testified that Je.M. told her that Magnan had touched her. Again, Magnan objected under Rule 803, and again he was overruled by the court under 801(d)(1)(B). The government also called Courtney Smith, who testified that R.M. once told her that Magnan touched her and her sisters in a "gross way." The defense made the same objection and was overruled.

For his part, Magnan called various family members who generally testified that Magnan was never alone with the accusers and that he never inappropriately touched them. Magnan also testified in his defense and denied ever touching the girls inappropriately.

---

[1] Rule 801 is the rule against hearsay, while 803 lists exceptions to the rule. Defense counsel later clarified that he intended to object under Rule 801.

[2] Federal Rule of Evidence 801(d)(1)(B) provides that evidence of prior consistent statements is admissible if offered: "(i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground . . . ."

At one point in the prosecution's closing argument, the government stated:

> Each of the—each of the M. girls—Ja.M., Je.M., and R.M.—said, "We didn't discuss details. We didn't tell our parents details. We didn't tell each other details." And they swore, "We were told not to talk about it, and we have not." And as they testified, and perhaps you saw their parents in the audience crying, it probably was the first time that they had heard those details.

## C.

Both the government and Magnan introduced different definitions for part (A) of the definition of "sexual act" within the Jury Instruction. Magnan's proposed definition for part (A) of the definition of "sexual act" was: "Contact between the penis the vulva or the penis or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight." Vol. 1 at 166. The government's proposed definition for part (A) of the definition of "sexual act," which the district court ultimately adopted verbatim, was: "contact between . . . the vulva or the penis and . . . contact involving the penis occurs upon penetration, however slight." Vol. 1 at 206 (ellipses in Instruction).

The jury found Magnan guilty as to all counts, except for count 4. For that count, the jury found Magnan guilty of simple assault, a lesser included offense of the charged crime of abusive sexual contact. He was sentenced to a total of 108 years' imprisonment. On appeal he asserts numerous defects in his trial and requests reversal of his convictions and remand for a new trial. He raises six arguments in support of his appeal, which we address in turn.

## II.

### A.

Magnan first argues that the prosecution's expert witness, Dr. Fred Lindberg, offered testimony that impermissibly bolstered the credibility of the victims. Because Magnan did not object to the testimony in question, we review for plain error. *United States v. Hill*, 749 F.3d 1250, 1257 (10th Cir. 2014). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1257–58 (quotations omitted). An error is plain if it is contrary to well-settled law. *Id.* at 1258. An error is contrary to well-settled law if it is contrary to rulings by the Supreme Court, this court, or the weight of authority from other circuits. *Id.*

An error affects substantial rights if there is a "reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Hasan*, 526 F.3d 653, 665 (10th Cir. 2008) (quotations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome [of the trial]." *Id.* (quotations omitted).

"The credibility of witnesses is generally not an appropriate subject for expert testimony." *United States v. Toledo*, 985 F.2d 1462, 1470 (10th Cir. 1993). This is because, "such testimony: (1) 'usurps a critical function of the jury'; (2) 'is not helpful to the jury, which can make its own determination of credibility'; and (3) 'when provided by impressively qualified experts on the credibility of other

7

witnesses is prejudicial and unduly influences the jury.'" *Hill*, 749 F.3d at 1258 (quoting *Toledo*, 985 F.2d at 1470). This court has also held that "expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not assist the trier of fact . . . ." *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999) (quotations omitted).

Magnan asserts that a portion of Dr. Lindberg's testimony was a form of impermissible credibility-bolstering testimony. He objects to the following exchange between the government and Dr. Lindberg:

Q. Okay. In your experience have you known alleged victims to make false allegations of child sexual abuse?

A. To make false?

Q. Yes.

A. Yes, ma'am. The literature says, of course, people lie. Children lie. There was a study at the Kempe Center in Denver. That's a national center. A study was conducted there in 1985 by a man by the name of Jones and later replicated in the year 2000 by a man by the name of Oakes. And what the two studies did, independently, of course, is to review 4- or 500 allegations of child sexual abuse. And then they went through and looked at the data and what information they had and made evaluations.

And what they determined was that both of these studies, the rate of false disclosures by or false allegations exclusively by a child was in the 2 to 4 percent range. Some literature goes as high as 5, maybe a little higher. But the standard studies that are frequently quoted are 2 to 4 percent.

Q. And do you know under what circumstances that usually happens?

A. Where the highest rate of false allegations occurs is in a custody/divorce setting.

8

According to Magnan, Dr. Lindberg's citation to studies that found only 2 to 4 percent of children lie about being sexually abused was the equivalent of vouching for the alleged victims. Magnan maintains that admitting this testimony was plain error and could have affected the outcome. Therefore, he concludes, reversal of his convictions is warranted.

We agree with Magnan—and the government does not dispute—that these statements by Dr. Lindberg were admitted in error. Though this court has not reached this precise issue, other courts have determined that the testimony complained of here—an expert placing a mathematical estimate on the rate of false accusations by victims—is a form of impermissible credibility-bolstering testimony. The Eleventh Circuit held that it was error for an expert witness to testify that 99.5 percent of children tell the truth about sexual abuse. *See Snowden v. Singletary*, 135 F.3d 732, 738–39 (11th Cir. 1998). The *Snowden* court intimated that such evidence was impermissible credibility-bolstering testimony that invaded the province of the jury. *Id.* at 738. Various state courts have reached the same conclusion. *See, e.g.*, *Powell v. State*, 527 A.2d 276, 279 (Del. 1987) (holding that it was plain error for an expert to testify that 99 out of the 100 children she had treated were telling the truth about sexual abuse, and that such testimony "deprived [the defendant] of his right to have his fate determined by a jury making the credibility determinations"); *State v. Myers*, 382 N.W.2d 91, 93 (Iowa 1986) (holding that it was erroneous for the prosecution to elicit testimony from a child abuse investigator that only one child had lied to her about being sexually abused in her 16 years of employment).

9

Here, we need not consider whether the error was plain, because even assuming that it was, we conclude that the error did not affect the defendant's substantial rights. To prove this, Magnan must "demonstrate a reasonable probability that but for the error claimed, the result of the proceeding would have been different." *Hill*, 749 F.3d at 1263 (quotations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Hasan*, 526 F.3d at 665 (quotations omitted)). "The reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *Id.* at 1263–64 (quotations omitted).

Magnan insists that because the prosecution's case rested on the testimony of the victims—and thus their credibility—the erroneously admitted credibility-bolstering testimony very likely affected his substantial rights. It is true that an expert's testimony about whom to believe could influence the jury. *See United States v. Whitted*, 11 F.3d 782, 787 (8th Cir. 1993) (reversing for plain error because an expert gave the "thinly veiled" opinion that the victim of alleged sexual abuse was telling the truth in a case that boiled down to a credibility contest between the defendant and the alleged victim). And we note the lack of physical evidence or eyewitness testimony to the alleged abuses in this case. However, based on the "complete record" before us, we are not convinced that there is a reasonable probability that Dr. Lindberg's testimony was a deciding factor in this case. *See Hill*,

749 F.3d at 1266; *United States v. Gonzalez-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005).

Six different victims testified about hundreds of abuses that occurred in and around Magnan's home over several years. Their testimony about these incidents was detailed and largely consistent. The trial took four days, involved twenty witnesses, and resulted in roughly 850 pages of trial transcript. The challenged testimony of Dr. Lindberg occupies about two pages. At no point did the prosecution refer back to the erroneous testimony, and it did not rely on it at closing argument.

Magnan points to a number of cases where courts have found substantial rights to be affected in similar contexts, but we conclude that the errors in those cases were far more prejudicial than the error here. For example, in *Snowden*—the case most relied upon by Magnan—the prosecution heavily stressed the significance of the expert's rate-of-false-accusations testimony in its closing argument. *Snowden*, 135 F.3d at 738. The Eleventh Circuit noted that

> this case is not one in which the prosecution's expert's view of victim credibility was touched on only briefly at the trial. In the prosecutor's argument to the jury, he stressed the significance of the expert's opinion about the credibility of child victims of supposed sexual abuse. Over and over again, the prosecutor hit the point hard . . . .

*Id.*

In its closing argument, the prosecution repeated several times the expert's claim that 99.5 percent of children do not lie about being sexually abused. *Id.* Here, in contrast, the prosecutor did not repeat the erroneous testimony in closing argument. To be sure, she relied on Dr. Lindberg's testimony about the general

11

characteristics of pedophiles and their victims throughout the argument, but at no point did she repeat his rate-of-false-accusations testimony. This reduces the risk that Magnan's substantial rights were affected.

Magnan also relies on *Hill* to demonstrate that reversing for plain error is appropriate where the government puts on expert witnesses who tell the jury how to make credibility determinations. However, as with the testimony in *Snowden*, the testimony at issue in *Hill* was far more prejudicial than the testimony here. In *Hill*, the prosecution called FBI Special Agent Jones to testify about the believability of the defendant during an interrogation. *Hill*, 749 F.3d at 1255. Special Agent Jones testified about his experience in interrogations and interviewing after attending two specialized courses in interrogation and interviews that trained him how to determine if a suspect was lying. *Id.* He further testified that he had conducted over a thousand interviews as an FBI special agent. *Id.* On direct examination, he extensively described his interrogation of the defendant, pointing out behaviors that he determined indicated the defendant was lying. *Id.* at 1256–57. Special Agent Jones testified "flatly and repeatedly that, in his expert opinion, [the defendant] was dishonest during his interview." *Id.* at 1263. And, as in *Snowden*, the prosecution referred to this opinion testimony in closing argument. *Id.* at 1257.

Special Agent Jones's credibility testimony had a far more prejudicial impact on the case than the testimony challenged here. While Dr. Lindberg's testimony about the rate of false accusations should not have been admitted, he stopped well short of informing the jury whom to believe. Unlike in *Hill* (and unlike the other

12

cases cited by Magnan), Dr. Lindberg never interviewed either the defendant or the accusers, adding a further layer of removal from his statements. Special Agent Jones narrated a devastating, blow-by-blow explanation of why the defendant was lying in his interview; Dr. Lindberg, rather dryly, stated that two studies had reached variable conclusions about the general rate of false accusations. While this court determined that Special Agent Jones's testimony could have unduly influenced the jury, the *Hill* holding does not compel the same result here. The magnitude of the errors is simply not equivalent.

In *Charley*, a factually similar situation to this one, this court found that the defendant's substantial rights were not affected. In *Charley*, an expert vouched for the truthfulness of two girls who claimed sexual abuse. 189 F.3d at 1267. As in this case, there was no physical evidence of abuse and no eyewitnesses to the alleged misdeeds. *Id.* at 1271. Despite the fact that the case was essentially a credibility contest, this court did not find that the defendant's substantial rights were affected. *Id.* at 1272. We noted that the two alleged victims corroborated each other, the victims had undisputed and documented medical and emotional conditions consistent with sexual abuse, the defendant had a prior conviction for sexual abuse of a child, and "only a small, albeit important, portion of the testimony admitted at trial was erroneously admitted." *Id.* at 1271. Here, as in *Charley*, the victims corroborated

each other with largely consistent stories.  And the erroneous portion of testimony was very small in comparison to the entire trial.[3]

After reviewing the record, we conclude that the error in admitting a portion of Dr. Lindberg's testimony concerning the rate of false accusations by sexual abuse victims did not affect Magnan's substantial rights.  Accordingly, under plain error review, reversal of his convictions is unwarranted.

**B.**

Magnan also argues that the district court erred when it allowed the government to put on three witnesses who testified about prior consistent statements made by the victims.

"We review a district court's admission of evidence for abuse of discretion and will reverse a decision only if it is manifestly erroneous."  *United States v. Tenorio*, 809 F.3d 1126, 1130 (10th Cir. 2015) (quotations omitted).

Federal Rule of Evidence 801(d)(1)(B) provides that evidence of prior consistent statements is admissible if offered: "(i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness

---

[3] We have examined the other cases proffered by Magnan that have found reversible error when improper expert testimony has been introduced.  *See, e.g.*, *Powell*, 527 A.2d at 279; *United States v. Brooks*, 64 M.J. 325, 329 (C.A.A.F. 2007); *Myers*, 382 N.W.2d at 93; *State v. Vidrine*, 9 So.3d 1095, 1111 (La. App. 2009); *Aguilera v. State*, 75 S.W.3d 60, 64–66 (Tex. App. 2002).  None of them is controlling authority and, like with *Hill* and *Snowden*, we find them distinguishable in important respects.

when attacked on another ground . . . ." The Rule places limits on when prior consistent statements may be admitted: "admissibility under the Rules is confined to those statements offered to rebut a charge of recent fabrication or improper influence or motive." *Tome v. United States*, 513 U.S. 150, 157 (1995) (quotations omitted). "Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." *Id.* "The Rule speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told." *Id.* at 157–58. It is a "requirement [of the Rule] that the consistent statements must have been made before the alleged influence, or motive to fabricate, arose." *Id.* at 158.

Magnan contends that the district court abused its discretion by permitting witnesses to testify that three of the victims—Ja.M., Je.M., and R.M.—had previously told others they were being sexually abused by Magnan contemporaneous to the alleged abuse. Specifically, following Ja.M.'s testimony, the government called Eileen SunRhoades, who testified that when both she and Ja.M. were in the sixth grade, Ja.M. told her "that her grandpa—she didn't say who—was touching her . . . like sexual touching." Following Je.M.'s testimony, the government called Elsie Marquez who testified that, in the fifth or sixth grade, Je.M. told her that Magnan molested her. And following R.M.'s testimony, the government called Courtney Smith, who testified that R.M. told her that, when they both were sophomores, that Magnan "touche[d] her and her sisters . . . in a gross way."

15

According to Magnan, this testimony should not have been admitted because it does not fall within the purview of Rule 801(d)(1)(B). Under the Rule, prior consistent statements are only admissible "to rebut an express or implied charge that the declarant recently fabricated [the testimony] or acted from a recent improper influence or motive in so testifying." Magnan asserts that although he "denied that any of the incidents occurred, and, in that sense, implicitly suggested that all of the allegations had been fabricated, his defense was that the allegation[s] had been fabricated *from their inception, and more than four years before trial*, not that they had been 'recently fabricated,' as required under Rule 801(d)(1)(B)." Aplt. Br. at 24 (emphasis in original).

Magnan relies on *United States v. Kenyon*, 397 F.3d 1071 (8th Cir. 2005), in support of his argument that introduction of the consistent statements was an abuse of discretion. In *Kenyon*, the district court admitted a nurse's testimony regarding a conversation she had with the victim, A.L., during which A.L. described the alleged abuse she suffered at the hands of the defendant. *Id.* at 1075. The Eighth Circuit found it was error to admit that testimony because the defense presented no evidence to imply that A.L. fabricated the charges of abuse after her conversation with the nurse. *Id.* at 1080. As the court concluded, the statements were inadmissible because "the defense mounted a general attack on A.L.'s credibility, including allegations of bias against Kenyon, with no evidence to imply that A.L. had recently fabricated the matters previously recounted to [the nurse]." *Id.* at 1080–81.

16

We find this aspect of *Kenyon* to be instructive here and agree with Magnan that the prior consistent statements should not have been admitted. He introduced no evidence of prior statements by the victims that were inconsistent with what they told their friends or law enforcement, and did not attempt to argue that the victims' stories had changed over time. Certainly, Magnan's counsel attempted to discredit Ja.M., Je.M., and R.M. during cross-examination. However, at no point did he expressly or impliedly assert that the victims had recently fabricated their testimony. His attacks were limited to asking whether the victims told others the abuse was occurring, asking about their drug and alcohol use, and asking about their legal troubles. Because Magnan's counsel did not imply that the victims' stories were recently fabricated, there was nothing for the government to rebut. "Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." *Tome*, 513 U.S. at 157.

The government points to two specific statements Magnan's counsel made in its opening argument that it claims constitute a charge of recent fabrication:

> The evidence will show that all the allegations are years old and that it wasn't until the federal police began repeatedly and doggedly interviewing these girls that the prosecutor was able to cobble together enough evidence to even bring these charges.

And:

> Another claim that the government is going to make is that there is no way that somehow all these girls' stories could have come together to seem so similar. But if you think about it, this all originated from one person's story. And if you interview people enough times, their stories seem magically to align after time, especially after you give them months and even years to talk to each other about these stories.

17

The first statement seems to imply that the allegations were meager and stale, and that it took aggressive investigators to extract the allegations of abuse. This is an attack on the sufficiency of the evidence, rather than a claim of fabrication. The second statement could be taken to imply that the girls conspired to get their stories straight before trial. However, this vague statement does not specify which of the victims were supposedly changing their stories, when the stories were changed, what they were changed from, or why they were changed. Nor does it allege a recent improper influence or motive. These statements made during opening argument are neither specific nor significant enough to warrant the application of Rule 801(d)(1)(B).

In the alternative, the government argues that the testimony should be admissible under Rule 801(d)(1)(B)(ii). Subsection (ii) provides that prior consistent statements may be admitted "to rehabilitate the declarant's credibility as a witness when attacked on another ground." In 2014, the Rule was amended to split 801(d)(1)(B) into subsections. Fed. R. Evid. 801 (Advisory Committee's Note to 2014 Amendment). "The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness—such as the charges of inconsistency or faulty memory." *Id.* Additionally, "[t]he amendment does not change the traditional and well-accepted limits on bringing prior consistent statements before the factfinder for credibility purposes," and "does not allow

18

impermissible bolstering of a witness." *Id.*[4] Magnan did not attempt to "attack[] [the witness' credibility] on another ground"—that is, he did not extract inconsistent statements or accuse the victims of misremembering the alleged abuses—so admitting the statements would not rehabilitate the declarant's credibility. Accordingly, the government's reliance on Rule 801(d)(1)(B)(ii) is misplaced. *See United States v. Cox*, 871 F.3d 479, 486 (6th Cir. 2017) (using the Advisory Committee's Note to 2014 Amendment to find that "another ground" within Rule 801(d)(1)(B)(ii) included "faulty memory" and admitting a prior consistent statement *after* the defendant attacked the victim's purportedly faulty memory); *United States v. J.A.S., Jr.*, 862 F.3d 543, 545 (6th Cir. 2017) (finding the grounds for admission of evidence pursuant to Rule 801(d)(1)(B)(ii) sufficiently met where the defendant sought to impeach the victim on collateral grounds and the defendant's counsel cross-examined the victim); *Berry v. Beauvais*, No. 13-CV-2647-WJM-CBS, 2015 WL 5244892, at *2 (D. Colo. Sept. 9, 2015) (referencing the Advisory Committee Commentary to 2014 Amendment in cabining the applicability of Rule 801(d)(1)(B)(ii) to "[a]s before, prior consistent statements under the amendment may be brought before the factfinder only if they properly rehabilitate a witness whose credibility has been attacked").

---

[4] This court has long found the Advisory Committee notes instructive to understanding the Federal Rules of Evidence. *United States v. Roach*, 896 F.3d 1185, 1194 (10th Cir. 2018); *United States v. Summers*, 414 F.3d 1287, 1299 (10th Cir. 2005); *United States v. Guardia*, 135 F.3d 1326, 1330 (10th Cir. 1998); *United States v. Puckett*, 692 F.2d 663, 671 (10th Cir. 1982).

While admission of the testimony was in error, we must determine whether the error was harmless. This court must "discern whether the statements, in light of the whole record, 'substantially influenced' the outcome of the trial, or whether we are left in 'grave doubt' as to whether it had such an effect." *United States v. Tome*, 61 F.3d 1446, 1455 (10th Cir. 1995) (citation omitted) (on remand from the Supreme Court) (hereafter *Tome II*). After a thorough review of the trial record, we conclude that the erroneous testimony did not substantially influence the outcome.

Here, the challenged testimony came from three of the prosecution's fifteen witnesses, and served to corroborate the stories of three of the six victims. Accordingly, the credibility of the other three victims—A.A., C.A., and M.S.—was wholly unaffected by the erroneous testimony. We also consider the detail and descriptiveness of the prior consistent statements compared with the statements made by the victims at trial. The accusers provided lengthy, specific, and detailed accounts of Magnan's abuses, while the prior consistent statements—as recounted by SunRhoades, Marquez, and Smith—were brief statements devoid of specifics. This evidence, while admitted in error, was not a significant part of the trial.

This is in contrast to both *Kenyon* and *Tome II*, cases in which the convictions were reversed. In *Tome II*, "the erroneously admitted evidence was extremely compelling," and those accounts were "the most detailed accounts of the abuse presented at trial." *Id.* at 1455. "By comparison, the victim's own testimony at trial was not nearly as articulate or comprehensive in its description of the abuse." *Id.* That is the converse of how this case developed: the victims provided detailed

20

descriptions of the abuse, while the corroborating testimony was meager. And in *Kenyon*, there was only a single victim whose testimony was improperly bolstered by the nurse's "articulate description of the alleged abuse." *Kenyon¸* 397 F.3d at 1082. Here, in contrast, there are six victims and the improper testimony is minor in comparison.[5]

Accordingly, we conclude that the introduction of prior consistent statements was an abuse of discretion, but that the error was harmless.

## C.

Magnan also argues that it was error for the district court to allow the victims to testify as to uncharged incidents of sexual abuse. Victims A.A., Ja.M., Je.M., R.M., C.A., and M.S. testified about many instances, outside of the charged incidents, where Magnan found opportunities to touch them in sexually abusive ways. Magnan failed to object to the admission of this evidence, so we review for plain error. Federal Rule of Evidence 414 provides: "In a criminal case in which a

---

[5] Magnan argues that the error was not harmless because the prosecution referenced the erroneous testimony in its closing argument. The prosecution stated:

> What's more, many of the victims testified that they told a friend, they told somebody they were close to. And you heard from many of those friends that told you, yes, my friend Je.M. or Ja.M. or R.M. told me a secret. And the secret was about her grandfather touching her. Those victims told those friends long ago, not after they started making the allegations to their parents and to law enforcement but way before.

We have weighed that argument and do not think it tips the scales in Magnan's favor. Much like how the erroneous testimony was a small part of the trial in general, this single paragraph from the prosecution's lengthy closing argument is similarly minor.

defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant." Rule 414 provides an exception to the general rule codified in Rule 404 that prohibits the admission of evidence for the purpose of showing a defendant's propensity to commit bad acts. *United States v. Benally*, 500 F.3d 1085, 1089 (10th Cir. 2007). Courts are to "liberally admit evidence of prior uncharged sex offenses." *Id.* at 1090 (quoting *United States v. Meacham*, 115 F.3d 1488, 1492 (10th Cir. 1997)). However, a court must still conduct a Rule 403 balancing test and exclude the evidence "if its probative value is substantially outweighed by a danger of unfair prejudice." *United States v. Mann*, 193 F.3d 1172, 1173 (10th Cir. 1999) (quoting Federal Rule of Evidence 403).

When conducting the Rule 403 balancing test to Rule 414 evidence, a district court should consider the following factors:

> 1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence. When analyzing the probative dangers, a court considers: 1) how likely is it such evidence will contribute to an improperly-based jury verdict; 2) the extent to which such evidence will distract the jury from the central issues of the trial; and 3) how time consuming it will be to prove the prior conduct.

*United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998) (quotations omitted) (setting forth the Rule 403 test for Rule 413 evidence); *see United States v. Sturm*, 673 F.3d 1274 (10th Cir. 2012) (applying the *Enjady* factors to Rule 414 evidence).

22

The government, in a motion titled "Supplemental Notice of Government's Intention to Offer Evidence Pursuant [To] Federal Rules of Evidence 413 and 414, or in the Alternative Rule 404(b), Federal Rules of Evidence" (Notice), offered two bases for which the evidence could be admitted. It contended that the prior acts were "part and parcel of Defendant's pattern of grooming and abusive behavior and is inextricably intertwined with the offenses for which he is charged," and therefore the acts do not need to "fall under the purview of Rules 404(b), 413 or 414." Notice at 2. The government then made the argument that the evidence would be admissible anyway under those Rules. Magnan did not file a response to the government's Notice.

At a pretrial conference, while explaining its denial of Magnan's motion to sever the charges, the district court indicated that the prior act testimony would be admissible through Rules 413 and 414. Vol. 3 at 24–30 ("In the present case, the evidence presented by the witnesses . . . is not only highly probative given the similar circumstances of each allegation, but is otherwise admissible under Rules 413 and 414."). The district court also referenced the government's Notice in its discussion. *Id.* at 30 ("In conclusion, the United States has made a timely disclosure to the defendant and the Court of its intent to offer evidence of similar crimes under Rule 413 and 414."). Of note, the district court excluded the testimony of B.G., an alleged victim, finding that although her testimony was potentially appropriate under Rules 413 and 414, the testimony was inadmissible pursuant to Rule 403. *Id.* at 455–56.

23

We consider this to be sufficient to determine that the district court admitted the prior act testimony pursuant to Rules 413 and 414.

However, Magnan correctly points out that the district court's analysis fell short of the minimum requirements of Rule 403. Rule 403 requires the district court to perform a balancing test to determine if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *See United States v. Velarde*, 214 F.3d 1204, 1212 (10th Cir. 2000). "Because of the unique nature of character evidence, it is important that the trial court make a reasoned, recorded statement of its 403 decision when it admits evidence under Rules 413–415." *United States v. Castillo*, 140 F.3d 874, 884 (10th Cir. 1998) (quotations and citation omitted). The district court did not mention Rule 403 during its discussion of this evidence, instead offering only that the evidence admissible under Rules 413 and 414 is "highly probative." Vol. 3 at 29. This reasoning is insufficient according to our court's minimum requirements for a Rule 403 balancing analysis. *Castillo*, 140 F.3d at 884.

We recognize that our court can conduct a de novo balancing of the Rule 403 factors without requiring a remand of that issue to the district court. *See, e.g.*, *United States v. Lazcano-Villalobos*, 175 F.3d 838, 846–47 (10th Cir. 1999) (holding that this court can conduct a "de novo balancing where the trial court failed to make explicit findings to support a Rule 403 ruling"); *Glass v. Philadelphia Elec. Co.*, 34 F.3d 188, 191 (3d Cir. 1994) (holding that when a trial court fails to articulate its reasoning under Rule 403, an appellate court may, under appropriate circumstances, either "decide the trial

24

court implicitly performed the required balance; or, if we decide the trial court did not, we undertake to perform the balance ourselves" (quotations omitted)). Because of Magnan's failure to object to this testimony, we do not have the benefit of district court findings. We are, however, presented with a detailed record from which to conduct our evaluation.

In our case, the Rule 403 inquiry requires consideration of the *Enjady* factors. In considering the *Enjady* factors, "no single factor is dispositive." *Mann*, 193 F.3d at 1175. The first *Enjady* factor is "how clearly the prior act has been proved." *Enjady*, 134 F.3d at 1433. Under this factor, the district court must conclude "that a jury could reasonably find that the 'other act' occurred by a preponderance of the evidence." *Id.* (citation omitted). In our case, the victims gave detailed testimony regarding the sexual abuse— both charged and uncharged. Given the detailed testimony of the victims, we believe that there was sufficient evidence for the jury to conclude, by a preponderance of evidence, that the uncharged instances of child molestation occurred.

The second *Enjady* factor requires an analysis of "how probative the evidence is of the material fact it is admitted to prove." *Id.* When considering this factor, we must also consider the following: "(1) the similarity of the prior acts and the charged acts, (2) the time lapse between the other acts and the charged acts, (3) the frequency of the prior acts, (4) the occurrence of intervening events, and (5) the need for evidence beyond the defendant's and alleged victim's testimony." *Benally*, 500 F.3d at 1090–91 (citing *Guardia*, 135 F.3d at 1331). Each of the victims spoke extensively of the sexual abuse that occurred to them during the course of trial

25

related to charged and uncharged conduct. From the record, we are convinced that sub-factors one through four weigh in favor of admitting the testimony. And, although sub-factor five weighs slightly against the government, we pause to note the significance of this: the testimony related to the charged conduct was so strong that the need for testimony outside of the charged conduct was minimal. On balance, the sub-factors, and thereby the second *Enjady* factor, weigh in favor of admission.

The third *Enjady* factor is "how seriously disputed the material fact is." *Enjady*, 134 F.3d at 1433. As previously noted by this court, "[t]he more seriously disputed the material fact, the more heavily this factor weighs in favor of admissibility." *Sturm*, 673 F.3d at 1286. This factor goes to the nub of the case—Magnan vehmently denied that he was guilty and had the propensity to commit child sexual abuse. This factor also weighs in favor of admission.

The final *Enjady* factor is "whether the government can avail itself of any less prejudicial evidence." *Enjady*, 134 F.3d at 1433. The government intimates that there is a possibility that this factor does not weigh in favor of admissibility, Aple. Br. at 43, and we agree that it does not. We agree, however, by noting, again, that the amount of evidence regarding the charged conduct was so overwhelming in itself that this evidence surely would not be dispositive and most certainly did not need to be introduced. We conclude factors one through three weighed towards admission while factor four slightly weighed against admission.

District courts weigh the above factors against "1) how likely is it such evidence will contribute to an improperly-based jury verdict; 2) the extent to which such evidence

26

will distract the jury from the central issues of the trial; and 3) how time consuming it will be to prove the prior conduct." *Enjady*, 134 F.3d at 1433 (quotations omitted). We do not believe, in a case which was centered on sexual abuse where there were multiple victims and a large amount of testimony going toward the charged conduct, that any of these three factors would preclude admission of the evidence.

Because the *Enjady* factors weigh in favor of admission, we conclude that the probative value is not substantially outweighed by the danger of unfair prejudice. We thus conclude that this testimony was admitted properly.[6]

### D.

Magnan takes issue with a statement made by the prosecution in its closing argument. The prosecutor said, "[a]nd as [the victims] testified, perhaps you saw their parents in the audience crying, it probably was the first time that they had heard those details." Vol. 3 at 830. Magnan did not object to the prosecutor's closing argument. When a "defendant fails to object to a prosecutor's statement, reversal is warranted only when: (1) the prosecutor's statement is plainly improper and (2) the defendant demonstrates that the improper statement affected his or her substantial rights." *United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011). We do not evaluate whether the prosecutor's statement was improper because, even if it were, we find that Magnan has not satisfied his burden of showing that the statement

---

[6] Because we find no error in admission, we also find no merit in Magnan's argument regarding Jury Instruction 10, which, by Magnan's own admission, simply mirrors Rule 414. Aplt. Br. at 34.

affected his substantial rights. Under a substantial rights analysis, we ask "whether there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Id.* at 1106 (quotations omitted).

Magnan focuses on the following statement the prosecutor made in her closing argument:

> Each of the—each of the M. girls—Ja.M., Je.M., and R.M.—said, "We didn't discuss details. We didn't tell our parents details. We didn't tell each other details." And they swore, "We were told not to talk about it, and we have not." *And as they testified, and perhaps you saw their parents in the audience crying, it probably was the first time that they had heard those details.*

(challenged portion emphasized).

Magnan contends that this remark was an example of the prosecutor commenting on matters not in evidence (the reaction of the parents). *See United States v. Ainsworth*, 716 F.2d 769, 771 (10th Cir. 1983) ("[A prosecutor] may not mention facts not in evidence to support a finding of guilt."). Magnan also asserts that the comment was engineered to generate sympathy among the jurors. *See Moore v. Gibson*, 195 F.3d 1152, 1172 (10th Cir. 1999) ("This court does not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision.").

While "[p]rosecutors are not permitted to incite the passions of a jury . . . [t]his restriction is balanced . . . by the acknowledgement that in an emotionally charged trial, the prosecutor's closing argument need not be confined to such detached exposition as would be appropriate in a lecture." *Fleming*, 667 F.3d at 1104

28

(quotations omitted). Here, the prosecutor's statement was a singular and isolated observation out of a 19-page closing argument during a four-day trial. *See id.* at 1106 (considering whether the prosecutor's comments violated the defendant's substantial rights by analyzing the statement in the context of the entire trial). We cannot say that this isolated observation regarding the reactions of courtroom spectators creates a reasonable probability that the result of the proceeding would have been different had it not occurred. We thus conclude that Magnan has not shown, based on our review of the record in this case, that the comment affected his substantial rights.

### E.

A court can reverse for cumulative error when the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002) (quotations omitted). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Id.* (citation omitted). As this Court has noted, "there are inherent problems in cumulating unpreserved error (reviewed for plain error) with preserved error (reviewed for harmless error)." *United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008). Therefore, as our case law instructs, when there are both preserved and unpreserved errors, the cumulative error analysis should proceed as follows:

29

First, the preserved errors should be considered as a group under harmless-error review. If, cumulatively, they are not harmless, reversal is required. If, however, they are cumulatively harmless, the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error. In other words, the prejudice from the unpreserved error is examined in light of any preserved error that may have occurred. For example, the defendant may not be able to establish prejudice from the cumulation of all the unpreserved errors, but factoring in the preserved errors may be enough for the defendant to satisfy his burden of showing prejudice. If so, the fourth prong of plain-error review must then be examined.

*Id.*

We did not find error in the admission of evidence related to uncharged incidents of sexual abuse. Consequently, we do not factor this in our cumulative error analysis. However, we do factor the preserved error of the prior consistent statement testimony, and the unpreserved errors of Dr. Lindberg's percentage testimony and the prosecution's statement in closing argument in our cumulative error analysis.[7]

Since there is only one preserved error, there is no cause for a harmless-error analysis because there is no other preserved error with which to cumulate it. *Caraway*, 534 F.3d at 1302. We thus turn to whether the preserved error of improper admission of prior consistent testimony, when considered in conjunction with the unpreserved errors of admitting improper expert testimony and the prosecution's statement in closing argument, is sufficient to overcome the hurdles necessary to

---

[7] Because we did not decide whether the prosecutor's remarks regarding courtroom spectators was an error, we include it here.

establish plain error.  In other words, we ask whether the prejudice emerging from the unpreserved errors of the improper expert testimony and the prosecution's statement in closing argument and the preserved error of prior consistent statements together can establish prejudice.  *Id.* at 1303.  We conclude that it cannot.  In the cases reversing for improper expert testimony that bolstered witness credibility, the prosecutors generally relied heavily on the erroneous testimony.  *See Snowden*, 135 F.3d at 738 (prosecutor repeatedly stressed at closing argument the expert's conclusion that the victims were abused); *Powell*, 527 A.2d at 279 (one victim; prosecutor stressed expert's conclusion that 99% of child abuse accusers tell the truth); *Hill*, 749 F.3d at 1257 (expert personally interviewed the defendant and testified, unequivocally, that the defendant was lying); *Whitted*, 11 F.3d at 787 (one victim and expert witness "effectively told the jury that [the defendant] had committed a crime").  Here, the prosecutor never referred to Dr. Lindberg's erroneous testimony after it was given.  With respect to the prosecution's comment during closing statements, the prosecution's fleeting observation was in the context of a 19-page closing argument during a four-day trial.  *Fleming*, 667 F.3d  at 1105.  Any additional harm resulting from the preserved error—the improper admission of prior consistent statements—was far too slight to push prejudice over the line.  *Caraway*, 534 F.3d at 1303.  Accordingly, we reject Magnan's cumulative error argument.

**F.**

31

Finally, Magnan asserts that Jury Instruction 17 improperly defined the term "sexual act," as compared to its definition in 18 U.S.C. § 2246, and that this mistake led the jury to improperly return guilty verdicts for Counts 1, 8, 9, and 11. Because he did not object to the jury instructions, the standard of review is plain error.

Section 2246 defines "sexual act" as:

(2) the term "sexual act" means—

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;
>
> . . .
>
> (D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person . . . .

Magnan takes issue with how Jury Instruction 17 modified part (A) of the definition. The Instruction restructured part (A) to define "sexual act" as: "contact between . . . the vulva or the penis and . . . contact involving the penis occurs upon penetration, however slight." (Ellipses in Instruction). Magnan asserts that the changes materially altered the meaning of the definition of "sexual act." The original definition under § 2246 requires contact between the penis *and* the vulva, while the amended definition in the Instruction requires "contact between . . . the vulva or the penis . . . ." The amended definition, according to Magnan, could mean contact between *any* body part and the vulva. Magnan argues that, because the government elicited testimony that would satisfy the erroneous definition of "sexual act," but

32

would not satisfy the statutory definition, the jury could have convicted Magnan on legally insufficient evidence. He asserts this warrants reversal on Counts 1, 8, 9, and 11, which relied on the erroneous definition. The Jury Instruction could have possibly expanded the definition of "sexual act" beyond the statutory definition. It should have been "contact between the penis AND the vulva" (the statutory language), not "contact between . . . the vulva OR the penis" (the Instruction's language) (emphasis added). We agree with Magnan that the Instruction erroneously converted a conjunctive into a disjunctive.

Regardless, the error did not affect Magnan's substantial rights. First, the government was not attempting to prove part (A) of the definition of "sexual act" in Counts 1, 8, 9, and 11. It was attempting to prove part (D), which provides that a "sexual act" includes: "[T]he intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." This is evident from Jury Instructions 23, 25, 56, and 58, which directed the jury to find Magnan guilty as to Counts 1, 8, 9, and 11 if the elements of the crime were proved. Those Instructions correctly included the elements of the counts in question and sought to prove part (D) of the definition of "sexual act," namely that there was "contact between [Magnan's] hand and [the victims'] vulva . . . [w]ith intent to abuse, humiliate, harass or degrade [the victims], or gratify the sexual desire of Marvin Magnan . . . ." *Id.* The language about purpose—to "abuse, humiliate, harass, degrade [the victim], or arouse or gratify the sexual desire" of Magnan—

33

comes directly from part (D), and is absent from part (A). Furthermore, there was no talk of penetration at any point during the trial, which is an element of part (A) but not part (D). The jurors were being directed to part (D), not part (A).

Additionally, there is sufficient evidence on record to conclude that Magnan committed a sexual act under part (D) of the definition. Counts 1, 8, 9, and 11 allege that Magnan touched the vulvas of Ja.M., A.A., and Je.M. To be a "sexual act" under part (D) of the definition, the touching must be "not through the clothes," i.e. he touched them under the clothes. All three of those victims testified that this happened. *See* Vol. 3 at 290–91 (Ja.M. alleged Magnan touched her vagina under her clothes); *id.* at 153 (A.A. alleged similar touching); *id.* at 351 (Je.M. alleged similar touching).

Even if the Instruction's definition of part (A) of § 2246 was erroneous, the jury could—and likely did—convict Magnan based on the definition in part (D). For the foregoing reasons, we conclude that this Jury Instruction was not plainly erroneous.

## III.

For the foregoing reasons, we AFFIRM.

Entered for the Court

Allison H. Eid
Circuit Judge

34